IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWNIE S. MOON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 07-083 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

## **I. INTRODUCTION**

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Shawnie S. Moon and Defendant Michael J. Astrue, Commissioner of Social Security.[1] Plaintiff seeks review of final decisions by the Commissioner denying her claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* For the reasons discussed below, Plaintiff's motion is denied and Defendant's motion is granted.

---

[1] Pursuant to Fed. R. Civ. P. 23(d)(1), Michael J. Astrue, who became Commissioner of Social Security on February 12, 2007, is substituted for Jo Anne B. Barnhart in this action; *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

## I.   BACKGROUND

### A.   Factual Background

From 1989 to 2001, Plaintiff Shawnie S. Moon worked as an administrative assistant through a temporary placement agency, a cashier at a variety of retail locations, a housekeeper at a hotel, a park laborer, and a cake decorator for a grocery store. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 4, "Tr.," at 85.)

In May and June 2000, Plaintiff experienced two automobile accidents. In the first, the car she was driving was hit broadside by a turning driver; in the second, her vehicle was hit from the rear when she stopped to allow a pedestrian to cross the street. (Tr. 145; 327-328.) At the time, medical personnel did not perform x-rays of her spine or knees because Ms. Moon was in the later stages of pregnancy. According to Plaintiff, this meant that a "dislocated disc" in her back was not properly diagnosed. (Tr. 337.) Following the birth of her child, Ms. Moon began experiencing back and neck pain and on August 8, 2000, she consulted with Dr. Sarvotham Shetty who noted some limited range of motion, forward and backward, in the lumbosacral area of her spine. Dr. Shetty prescribed physical therapy for two weeks, after which Ms. Moon reported minimal pain, even with heavy activity; she was directed to continue exercising at home. (Tr. 133-134; 136-137.)

In September 2000, Ms. Moon began seeing doctors at the Tri-

2

State Medical Group, Inc., as her primary care physicians. (Tr. 151-184.) At her initial appointment, Plaintiff reported that she had recently completed physical therapy for her back and shoulder but that the pain continued, despite use of extra strength tylenol. She also noted that she had arthritis in both knees and felt that it was starting in her hands. (Tr. 165-166.) She was prescribed naprosyn[2] for pain and the nurse-practitioner recommended serious weight loss and more physical therapy for her knees. (Tr. 164.) In December 2000 and January 2001, she underwent a second course of physical therapy, again reporting improvement, but after missing several scheduled appointments due to "time restraints," she was discharged, again with instructions to continue her exercise program at home. (Tr. 138-148.)

At a follow-up appointment on February 6, 2001, Ms. Moon reported that physical therapy had been "very helpful" and that she was "doing much better." (Tr. 161.) At the time she had no complaints of pain except when she was on her feet working as a cashier or stocking shelves. On exam, her back showed normal alignment with no evidence of bony or musculoskeletal tenderness or

_____

[2] Naprosyn (naproxen), among numerous other purposes, is used in its prescription form to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, and/or ankylosing spondylitis (arthritis that mainly affects the spine). Naproxen is one of a number of non-steroidal anti-inflammatory drugs which work by stopping the body's production of a substance that causes pain, fever, and inflammation. See drugs and supplements information at the National Institute of Medicine's on-line website, Medline Plus, at www.nlm.nih.gov/medlineplus (last visited November 27, 2007), "Medline Plus."

3

sciatic tenderness. Her lower extremities also revealed a full range of motion and full muscular strength. (Id.) When Ms. Moon returned on September 20, 2002, she reported pain and numbness in her right hand for the past two months. (Tr. 160.) In December 2002, after reporting increased back pain radiating into her hip, Ms. Moon underwent x-rays of the lumbar spine and left hip. The x-ray of her hip revealed no evidence of fracture, dislocation or significant arthritis, and that of her lumbar spine showed well-maintained vertebral body heights and disc spaces, satisfactory alignment, unremarkable sacro-iliac joints, and no spondylolysis or spondylolisthesis.[3] (Tr. 158; 173-174.)

In February 2003, Ms. Moon began seeing Dr. Paul Hoover, a specialist in physical medicine and rehabilitation, complaining of increased pain in her lower left back, leg and shoulder after she fell on ice. (Tr. 264.) A month later, she reported that she was experiencing numbness when sitting or standing too long and Dr. Hoover noted L5-S1 protrusion with L5-S1 desiccative changes. (Tr. 263.) On May 18, 2003, she reported improvement with medication (Tr. 260), but by December, the pain had returned and Dr. Hoover diagnosed her with sub-acute radiculitis[4] at L5-S1. (Tr. 259.)

---

[3] "Spondylolysis" refers to disintegration or dissolution of a vertebra. "Spondylolisthesis" is the forward displacement of a lumbar vertebra on the one below it, producing pain by compression of nerve roots. *See* medical dictionary at Medline Plus.

[4] Radiculitis is the inflammation of a nerve root. *See* medical dictionary at MedlinePlus.

4

Although her medication was changed several times, the pain continued. (Tr. 260-255.) On February 7, 2004, Dr. Hoover performed a number of electromyography and nerve conduction studies and diagnosed Ms. Moon with degenerative disc disease of the lumbar spine, L5-S1, with radiculopathy.[5] Plaintiff also complained of increasing pain in her hands and in July 2004, Dr. Hoover directed her to have nerve conduction studies done which showed moderate bilateral carpal tunnel syndrome. (Tr. 253-254; Tr. 233.) When Plaintiff reported that she was experiencing pain and stiffness in her left side from her shoulder to her foot, numbness on both sides and "achy pain" and stiffness in her back, Dr. Hoover prescribed darvocet and ordered more x-rays and a bone scan. (Tr. 252.) An MRI of her cervical spine on July 12, 2004 showed normal vertebral alignment, "fairly well maintained" intervertebral disc spaces, no evidence of cervical disc herniation, and no other abnormalities except a "somewhat heterogeneous marrow signal intensity within the C6 vertebral body." (Tr. 240.) A bone scan on August 3, 2004, showed no indication of bone metastasis, degenerative changes in both feet and both knees, the latter "probably due to post-traumatic degenerative changes," but no degenerative changes in the cervico-dorsolumbar spine. (Tr. 239.)

Plaintiff continued to see Dr. Hoover regularly, reporting

---

[5] Radiculopathy refers to any pathological condition of the nerve root. *See* medical dictionary at MedlinePlus.

5

that she still had aches and spasms even though her medications took the "edge off." On November 9, 2004, at Dr. Hoover's recommendation, Ms. Moon consulted with Dr. Charles Pucevich, a rheumatologist. On examination, Dr. Pucevich noted a mild decrease of extension and rotation in Plaintiff's neck, mild discomfort on motion in both shoulders, minimal tenderness to palpation of her spine in general, good motion without discomfort in her hips, and discomfort to motion in both knees. On examination of her hands and arms, Ms. Moon exhibited no discomfort on motion in her wrists and right elbow but minimal discomfort in her left elbow, some tenderness in her hand joints, and good grip bilaterally. (Tr. 265-266.) A follow-up x-ray on November 17, 2004, showed mild to moderate degenerative changes in Plaintiff's right knee, but no fracture or joint effusion. (Tr. 267.)

In January 2005, Ms. Moon reported to Dr. Hoover that she was experiencing the "same pain" but that it was moving from left to right. (Tr. 301.) He directed Plaintiff to have new thoracic x-rays which showed "slight degenerative spur formation in the lower thoracic region," but no other abnormality. (Tr. 301-302.)

Ms. Moon had stopped working regularly sometime in 2001 as a result of the combined difficulties of being pregnant again and her back pain. (Tr. 60; 76.)

B. Procedural Background

On January 20, 2004, Ms. Moon applied for supplemental

6

security income and disability insurance benefits, alleging disability as of May 20, 2000, due to a dislocated disc, "mangled nerve," and glaucoma. (Tr. 49-51; 304-306; 60.) The Social Security Administration ("SSA") advised Ms. Moon on March 18, 2004, that it had concluded she was not disabled at any relevant time because she could return to her earlier employment as a cashier for a self-service gasoline station, which the SSA identified as being a light, unskilled occupation. (Tr. 32-35; 309-313; 31.)

Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held before Judge William E. Kenworthy on November 15, 2004, where Plaintiff was represented by counsel. Judge Kenworthy issued his decision on June 10, 2005, again denying benefits. (Tr. 14-22.) On December 7, 2006, the Social Security Appeals Council advised Ms. Moon that it had chosen not to review the ALJ's decision[6] (Tr. 4-6); therefore, the June 10, 2005 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on January 22, 2007, seeking judicial review of the ALJ's decision.

---

[6] Usually, the next step in the administrative procedure would be for the Social Security Appeals Council to reconsider the ALJ's decision to determine if there had been an error of law or abuse of discretion on his part. In selected test cases, however, this review step has been omitted. *See* 20 C.F.R. §§ 404.966; 416.1406.

7

## C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision

8

and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **ANALYSIS**

### A. The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income benefits, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[7] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be

---

[7] According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

expected to last for not less than twelve months. Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000); 42 U.S.C. § 1382c(a)(3)(C)(I).

To be granted a period of disability and receive disability insurance benefits, a claimant must show that she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Ms. Moon satisfied the first two non-medical requirements and the parties agree that Plaintiff's date last insured was September 30, 2001. Therefore, in order to receive a period of disability and DIB, Ms. Moon must show that she became disabled prior to that date; no such timing requirement applies in the case of SSI benefits.

In determining a claimant's rights to either type of benefit,[8] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits her ability to do basic work activity, she is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the

---

[8] The same test is used to determine disability for purposes of receiving either DIB or SSI benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under either type of benefits.

10

Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC")[9] to perform her past relevant work, she is not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, she is not disabled.

20 C.F.R. § 404.1520(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support her position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[10] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Kenworthy first concluded that although Ms. Moon alleged in her applications for benefits that she had become disabled as of May 20, 2000, the date of her first automobile accident, she had continued to work after that date, thus contradicting that claim. She also testified she

---

[9] Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations. Fargnoli v. Halter, 247 F.3d 34, 40 (3d Cir. 2001). Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[10] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n.5 (1987).

11

had last worked as a cake decorator in February 2002, but her earnings report showed no income for that year. The ALJ concluded, based on all the evidence, that the time period under consideration would begin as of March 2001. (Tr. 19.)

At step two, the ALJ found Ms. Moon's impairments were bilateral post-traumatic arthritis of the knees, obesity, chronic lumbosacral strain, and carpal tunnel syndrome,[11] all of which were "severe" impairments as that term is defined by the SSA.[12] (Tr. 19-20.) However, at step three, the ALJ concluded none of Plaintiff's impairments, considered singly or in combination, satisfied the criteria of any of the musculoskeletal listings. (Tr. 20.)

At step four, the ALJ stated that in arriving at his decision regarding the extent of Plaintiff's residual functional capacity, he had considered all the medical evidence, medical opinions, and Plaintiff's subjective complaints. He concluded Ms. Moon could

_____

[11] The ALJ did not address any limitations arising from Ms. Moon's bilateral glaucoma and congenital cataract in her left eye. (See ophthalmology records at Tr. 192-199.) However, Plaintiff does not raise any objections to the ALJ's analysis in this regard and the Court will not consider those impairments in detail.

[12] See 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n5.

12

lift and carry up to 10 pounds occasionally, assuming she could remain seated most of the work day with a sit/stand option at intervals of 15 to 20 minutes. Standing and walking would be limited to about two hours total per day, and she must be able to use a cane. Ms. Moon could not be expected to perform repetitive or forceful work with her hands, and could not climb ladders, kneel, crouch, or crawl. Finally, she must avoid exposure to temperature extremes, vibrations, humidity, hazardous operations and heights. (Tr. 20.)

L. Leon Reid, Ph.D., a vocational expert ("VE"), did not testify at the hearing, but responded to the Judge's written interrogatories, indicating that there were numerous jobs available in the local and national economies which a person of Plaintiff's limitations could perform, e.g., cashier at a self-service gasoline station, parking-lot cashier, surveillance equipment monitor, telephone surveyor, or appointment clerk. Dr. Reid also stated that these were all sedentary[13] jobs at the unskilled or lower semi-skilled range; this included the two cashier positions which were rated by the *Dictionary of Occupational Titles* as light-level work, but which Dr. Reid stated could be performed at the sedentary

---

[13] The term "sedentary" describes work which requires lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Jobs are sedentary even if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567. A sedentary job should require no more than approximately 2 hours of standing or walking per eight-hour work day, and sitting should typically amount to six hours per eight-hour work day. Social Security Ruling 83-10.

13

level. (Tr. 118-119.)

Therefore, given Plaintiff's status as a younger individual[14] with a high school education, a work history of light to medium occupations, her RFC, the medical evidence of record, and the written opinions of the VE, the ALJ determined at step five that Ms. Moon was not disabled at any time prior to the date of his opinion, and, consequently, not entitled to benefits. (Tr. 22.)

## B. Plaintiff's Arguments

Ms. Moon raises only a single (albeit multi-part) argument in support of her motion for summary judgment: that is, the ALJ erred by failing to discuss (or alternatively, by failing to give appropriate weight to) a residual functional capacity assessment completed by Dr. Hoover on February 9, 2004 ("the February assessment") and addressing only his November 2, 2004 medical opinion ("the November assessment.") Plaintiff argues that "in essence," Dr. Hoover's February assessment was that "Plaintiff could not complete a normal work day without the need to lie down at least 2 hours during the work day," a limitation which would logically lead to the conclusion that she was disabled. (Plaintiff's Brief in Support of Motion for Summary Judgment, Docket No. 8, "Plf.'s Brief," at 9.) By dismissing the February assessment without explanation, the ALJ violated 20 C.F.R. §§

---

[14] Plaintiff was 32 years old at the time of the hearing, meaning she fell within the category defined as a "younger individual," i.e., less than age 50. 20 C.F.R. § § 404.1563; 416.963.

14

404.1527 and 416.927 which require him to consider any medical opinions from acceptable medical sources which reflect judgments about the nature and severity of a claimant's impairments and resulting limitations. This failure constitutes an error of law which "renders the decision unreasoned and not supported by substantial evidence of record." (Plf.'s Brief at 10.)

Plaintiff further argues that while normally such failure would require remand in order to allow the ALJ to explain the weight given to the February assessment and/or why he had rejected it, remand is unnecessary in this case because the ALJ previously determined that Dr. Hoover's opinions were entitled to controlling weight. If, as the ALJ concluded with respect to the November assessment, Dr. Hoover's opinions are well supported by objective medical evidence and are not inconsistent with other substantial evidence of record, the same should be true for the February assessment. Because Dr. Hoover's notes show that Plaintiff's condition has worsened over time, "logic would dictate that Dr. Hoover would not opine that Plaintiff's limitations have diminished." At a minimum, the two assessments, as clarified by Dr. Hoover's supplemental reports dated August 18 and 25, 2005, should be read together. When great or controlling weight is given either to the February assessment or to both assessments, it is clear Plaintiff was disabled and should have been awarded DIB and SSI not later than January 20, 2004, the date on which she filed

her applications. (Plf.'s Brief at 11-12.)

Finally, Plaintiff argues in the alternative that at a minimum, remand is necessary in order to clarify Dr. Hoover's opinions because under Social Security Ruling 96-5, the SSA must "make every reasonable effort to re-contact sources for clarification when they provide opinions on issues reserved for the Commissioner and the basis for the opinions are not clear." By failing to follow-up with Dr. Hoover regarding nature of his restrictions, the ALJ compounded his previous errors. (Plf.'s Brief at 12-13.)

## C. Analysis of Plaintiff's Arguments

We begin our analysis by summarizing Dr. Hoover's February and November assessments. The February 2004 assessment was composed of two documents, a questionnaire focused on spinal disorders and a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities." (Tr. 186-191.) In the latter, Dr. Hoover stated the following limitations:

- Frequently lift and carry 2-3 pounds and occasionally lift and carry 10 or 20 pounds;

- Cumulative capacity to stand and walk 2 or 3 hours during an 8-hour day, in 15 minute increments;

- Cumulative capacity to sit 2 or 3 hours during an 8-hour day, in 15 minute increments;

- Use of hand controls (pushing and pulling) limited to 20 pounds of force; no limitation in lower extremities;

- Bending, stooping, balancing and climbing entirely

16

excluded; only rare ability to kneel or crouch;

- Fingering and feeling affected by some fingertip numbness, otherwise no limitations on other physical functions, i.e., reaching, handling, seeing, hearing, speaking, tasting/smelling, or continence; and

- Environmental restrictions excluding exposure to heights, moving machinery, or temperature extremes.

(Tr. 190-191.)

In the spinal disorder questionnaire, Dr. Hoover noted:

- Diagnoses of disc protrusion at L5-S1, degenerative disc disease at L5-S1, and radiculopathy;

- Pain occurring with "all motions and sit/walk/stand too much;"

- Paravertebral muscle spasm, positive straight leg raising both supine and seated; decreased sensation in left leg and finger tips; atrophy;

- Range of motion flexion/extension in the dorso-lumbar region limited to 10-30 degrees with right and left lateral flexion at the maximum of 20 degrees; no range of motion limitations in the cervical region;

- No ankylosis of the spine or arachnoiditis, but evidence of pseudoclaudication[15] in the left leg;

- The ability to get on and off an examining table and arise from a chair; inability to squat or rise from a squatting position, and "bare" ability to walk on heels and toes;

---

[15] Ankylosis is defined as stiffness or fixation of a joint as the result of disease or surgery; arachnoiditis is inflammation of the middle of three spinal cord membranes. *See* medical dictionary at MedlinePlus. Pseudoclaudication is pain and discomfort in the buttocks, legs and feet with walking or prolonged standing due to pressure on the spinal root nerves caused by narrowing of the lumbar spinal canal (spinal stenosis.) *See* www.mayoclinic.com/health/ - - - pseudoclaudication/HQ01278 (last visited November 27, 2007.)

17

- No use of a hand-held walking device or orthotic device; and

- No surgery and (according to the form) no medication.

(Tr. 186-189.)

In a similar medical source statement completed on November 2,

2004, Dr. Hoover noted:

- The ability to occasionally lift and/or carry 10 pounds and frequently lift and/or carry less than 10 pounds;

- Cumulative capacity to stand and/or walk at least 2 hours during an 8-hour day, 15 to 20 minutes at a time;

- No limit on a specific number of hours sitting during an 8-hour day, but a note that sitting must be alternated with standing every 15 to 20 minutes;

- Limited use of both upper and lower extremities in the operation of controls involving pushing or pulling;

- No ability to climb, balance, kneel, crouch, crawl or stoop;

- No more than occasional ability to do any manipulative functions, i.e., reaching, handling, fingering or feeling;

- No visual or communicative limitations; and

- Multiple environmental restrictions, e.g., limited exposure to temperature extremes, vibration, humidity, hazards, and fumes, odors, chemicals or gases.

(Tr. 229-232.)

In his opinion, Judge Kenworthy stated the following with regard to the February and November assessments:

18

The claimant has been seen frequently since February, 2003, by Paul Hoover, M.D., who is board-certified in physical medicine and rehabilitation. Dr. Hoover has submitted two assessments of the claimant's residual functional capacity. . . .I have given controlling weight in this case to the most recent assessment, completed by Dr. Hoover on November 2, 2004. 20 C.F.R. § 416.927(e). This assessment is significantly more limited than the opinion of Michael Niemec, D.O., who expressed the belief that the claimant would be capable of performing work at the medium exertional level.

(Tr. 20-21, citing, in addition to the two assessments, the March 10, 2004, findings of a state agency examiner, Tr. 200-209.)

In discussing Plaintiff's allegations of debilitating pain, the ALJ further noted with regard to Dr. Hoover, "It is considered that the extent of her pain is not inconsistent with an ability to perform activities within the functional capacity assessed by her treating physician,[16] who is familiar with the claimant's subjective complaints." (Tr. 21.) It is also clear from the text of the ALJ's opinion that he considered Dr. Hoover's records in their entirety since he refers to objective studies performed in April 2003, February 2004, and July 2004 on which Dr. Hoover's diagnoses were based, and the report of Dr. Pucevich who had examined

[16] Social Security regulations identify three general categories of medical sources - treating, non-treating, and non-examining. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, for example, a consultative examiner who is not also a treating source. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. 20 C.F.R. § 404.1502.

19

Plaintiff at Dr. Hoover's recommendation. (Tr. 20.)

These are the only statements made by the ALJ regarding Dr. Hoover's opinions. In short, there is nothing in the decision which would support Plaintiff's argument that the ALJ failed to explain why he gave "controlling weight" to the November assessment - he stated he did so because it was the more recent opinion. Similarly, there is no support for Plaintiff's argument that at a minimum, remand is necessary so the ALJ can contact Dr. Hoover to clarify his opinions. The ALJ expressed no confusion about the medical basis of either of the two assessments, nor did he question whether objective medical evidence supported the November assessment. As Plaintiff clearly acknowledges, such efforts to clarify medical opinions are required only when the basis for a medical opinion is not clear. *See* Plaintiff's Brief at 12, *citing* Social Security Ruling[17] 96-5, "Medical Source Opinions on Issues Reserved to the Commissioner," which states in relevant part:

Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for

[17] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

20

the opinion.

Neither is the Court persuaded by Plaintiff's argument that adoption of the February assessment would inevitably result in a finding that she was disabled. A treating source's evaluation of an individual's ability to do work-related activities may be similar, but is not necessarily identical, to an adjudicator's determination of the individual's residual functional capacity. A medical source statement is an opinion provided to an adjudicator by an acceptable medical source[18] about a claimant's limitations based on the source's own knowledge of the claimant's medical history. 20 C.F.R. §§ 404.1513(b) and (c); 416.913(b) and (c). An RFC assessment is the adjudicator's ultimate finding based on consideration of medical source statement(s) and all other evidence in the case record about what an individual can do despite her impairments. *See* SSR 96-5p, *citing* 20 C.F.R. §§ 404.1545, 404.1546, 416.945, and 416.946.

To the extent Plaintiff relies on the ALJ's statement that he gave "controlling weight" to Dr. Hoover's November assessment and argues that, by extension, the same should hold true for his more restrictive February assessment, the regulations are clear that controlling weight may be given to the medical opinion of a

---

[18] *See* 20 C.F.R. § 404.1513(a), defining acceptable medical sources as licensed physicians, optometrists, and podiatrists; licensed or certified psychologists; and qualified speech-language pathologists.

21

treating source as to the nature and severity of the claimant's
impairments, but that such an opinion is to be given no special
significance on the ultimate outcome of the RFC analysis. 20
C.F.R. § 404.1527(e)(3). Plaintiff's argument that either the
February assessment or both assessments read together leads to the
inevitable conclusion that she was disabled rests on a far too wide
reading of the statute. Determining whether a claimant is disabled
is one of the ultimate issues reserved to the Commissioner, and, as
the ALJ herein explicitly noted, is based on consideration of "all
of the relevant evidence, including the medical evidence, the
medical opinions . . . and the claimant's subjective complaints."
(Tr. 20.)

Nevertheless, in ascertaining the claimant's RFC, the
adjudicator must adopt any treating source medical opinion to which
the adjudicator has given controlling weight under the rules in 20
C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). See SSR 96-5p. Judge
Kenworthy correctly observed this directive by stating that he was
giving controlling weight to Dr. Hoover's November medical opinion
regarding the nature and severity of Plaintiff's limitations, i.e.,
lifting and carrying "up to 10 pounds occasionally;" standing and
walking "about two hours total per day;" a "sit/stand option at
intervals of 15-20 minutes;" and avoiding "repetitive or forceful
use of her hands" as well as kneeling, crouching, or climbing
ladders, and environmental conditions such as temperature extremes,

22

vibrations, humidity, hazardous operations or exposed heights.

Finally, we turn to Plaintiff's arguments which rest on Dr. Hoover's letters which purportedly "clarify" his earlier assessments. Following the hearing on November 15, 2004, and the ALJ's denial of benefits on June 10, 2005, Plaintiff sought review by the Appeals Council on June 15, 2005. (Tr. 6.) In a letter written August 3, 2005, stating her arguments in support of her position that the ALJ had erred in his decision, Plaintiff sought permission to submit a report from Dr. Hoover to clarify his February and November opinions. (Tr. 314-321.) Apparently assuming such permission would be forthcoming, on August 30, 2005, Plaintiff submitted two letters from Dr. Hoover. (Tr. 320-322.)

In the letter of August 18, 2005, Dr. Hoover stated first that Ms. Moon's overall condition did not change significantly during the period February 9, 2004, through November 2, 2004; that is, she had "periodic flare up of symptoms," including a severe flare-up in February, which subsided "somewhat" with medication. (Tr. 321.) Dr. Hoover continued:

> To clarify the issue of disability recommendations, the standing/walking discussed on the Medical Source Statement . . . dated 02/09/2004, was total capacity in an 8 hour day and I checked the box that is "more than 2, less than 6 hours" with clarification that the less than 6 hours is actually 2 to 3 hours total in a day with 15 minutes stand/walk at a given time. This does not imply that [the] patient is capable of working an 8-hour day with such capacities. The recommendations of disability rendered on 11/02/04 . . . was [sic] that I checked the box "at least two hours in an 8 hour work day" which is compatible with the answer provided 02/09/04 and also

23

rendered as 15 to 20 minutes at a time of stand/walk
capacity on that occasion. These are [sic] the same
degree of incapacity in standing/walking tolerance for
the patient which is a severe limitation due to the
spinal disorder with spasms and decrease range of motion
for which she was referred to neuro-surgical care on
[her] most recent visit of 05/10/05.

(Tr. 321.)

For reasons which are not clear from the record or from
Plaintiff's brief, Dr. Hoover submitted an addendum to this letter
dated August 25, 2005, in which he stated:

It is my opinion, stated within a reasonable degree of
medical certainty, that the following limitations are
appropriate for Shawnie Moon:    Patient is limited to
sitting 2 to 3 hours, 15 to 20 minutes at a time, per an
8 hour workday as of November 2, 2004, and following to
present.

(Tr. 322.)

Defendant argues that Plaintiff cannot rely on the evidence
she submitted to the Appeals Council more than two months after the
ALJ issued his decision and has failed to show that the evidence is
new and material; moreover, she has failed to show there was good
reason for not providing these "clarifications" to the ALJ.
(Defendant's Brief in Support of His Motion for Summary Judgment,
Docket No. 10, at 22-23.)   We agree.

Matthews v. Apfel, 239 F.3d 589 (3d Cir. 2001), establishes
the guidelines a district court in the Third Circuit[19] must observe

---

[19]   The Court recognizes that the Circuits are split on the
question of whether a district court may consider evidence submitted
to the Appeals Council but not the ALJ when the Appeals Council has
denied a request for review of the ALJ's decision.  See Tate v. Comm'r
of Soc. Sec., 368 F. Supp. 2d 661, 668, n. 2 (E.D. Mich. 2004), noting

24

when confronted with a situation in which evidence was submitted to the Appeals Council but was not before the ALJ at the time he made his decision regarding award or denial of benefits. The Court in Matthews reasoned that, as a matter of "sound public policy," a disability claimant should present to the ALJ "all relevant evidence" concerning her impairment in order to provide for "the speedy and orderly disposition of Social Security claims" and to avoid situations where a claimant could withhold evidence from the ALJ in order to preserve a reason for remand.  Id. at 595.  The exception to this rule is that a district court may consider new and material evidence as the basis for remand where the plaintiff offers "good reason" for not having brought it before the ALJ initially.  Id.  Evidence is "new" if it is not merely cumulative of evidence already in the record; it is "material" if it is relevant to the time period in question, probative, and there is a "reasonable possibility" that its consideration would have changed the outcome of the ALJ's analysis.  Szubak v. Sec. of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984).  The third prong of the Matthews test is satisfied if the plaintiff provides "some justification for the failure to acquire and present such evidence

---

that the Courts of Appeal for the First, Third, Sixth, Seventh and Eleventh circuits have decided that the district court is limited to the record before the ALJ, while the Courts of Appeal for the Second, Fourth, Eighth, Ninth and Tenth circuits allow new evidence submitted to the Appeals Council to become part of the record to be considered in the court's "substantial evidence review."  The Fifth Circuit has not conclusively addressed the issue.

to the [ALJ.]" Szubak, id. at 834.

While the August 15 and August 28, 2005 letters from Dr. Hoover are relevant to the time period in question since they relate to his assessments of February and November 2004, Plaintiff offers no reason why, if her counsel believed the assessments needed to be "clarified," Dr. Hoover did not do so earlier but instead offered this evidence only after the ALJ adopted the November assessment rather than the more restrictive February assessment. This is especially relevant given the facts that the ALJ held the record open after the hearing in order to receive additional medical evidence and Dr. Hoover continued to treat Plaintiff, as shown in his statement that he had referred her to neuro-surgical care as of May 10, 2005.

Moreover, we find that in all likelihood, had the August 15, 2005 letter been part of the evidence before the ALJ, it would not have changed the outcome of his decision. We base this conclusion on Dr. Hoover's statement that between February 9 and November 2, 2004, "overall in that period of time, the patient's clinical examination did not significantly change" and that her condition in February reflected a periodic "severe flare-up of symptoms" which subsided "somewhat with medications." (Tr. 321.) If Plaintiff's clinical condition was essentially unchanged and her condition in

26

February was a "flare-up" rather than the norm,[20] then the ALJ did not err by relying on the November assessment in determining her RFC. *Compare* Fouch v. Barnhart, No. 03-1180, 2003 U.S. App. LEXIS 23033, *11-*13 and n.2 (3d Cir. Oct. 16, 2003), where the Court rejected a letter submitted by the plaintiff's long-term treating physician some two years after the ALJ's decision, not only because he did not provide good reason for waiting so long but because the Court found the letter was probably not "new" evidence since its purpose was to merely "clarify" the physician's opinion provided at the hearing.

We conclude that the record, as a whole, contains substantial evidence to support the ALJ's findings that Plaintiff was not disabled at any time under consideration. Where such evidence exists and the ALJ has explained his reasoning, this Court may not reject those findings even if we would have made a different choice had we considered the matter *de novo*. *See* Claussen v. Chater, 950 F.Supp. 1287, 1292 (D. N.J. 1996)(although "reasonable minds can reach different conclusions following review of the evidentiary record upon which the Commissioner's decision is based, . . . . in such cases, a district court's function is to determine whether the record, as a whole, contains substantial evidence to support the Commissioner's findings.") The Court finds that the ALJ did not

---

[20] We also note for the record that sometime between December 8, 2003, and February 2, 2004, Plaintiff had exhausted her supply of naproxen which she stated had stopped working anyway. (Tr. 258-259.)

27

err by relying on Dr. Hoover's November assessment, nor by failing to seek further explanation of his medical records. Similarly, we find that this matter need not be remanded for consideration of the August 2005 letters which purportedly clarify his assessments inasmuch as Plaintiff has offered no good reason why this evidence was not presented to the ALJ in a timely manner.

Having considered each of the arguments raised by Plaintiff in the brief in support of her motion for summary judgment, we find none of them persuasive. Plaintiff's motion for summary judgment in her favor is therefore denied. An appropriate Order follows.

November _3 9ᵗʰ_, 2007

William L. Standish
United States District Judge

cc: Counsel of Record

28